Yes, Ms. Sharpless, you were court-appointed. We appreciate that having taken the case. Mr. Dominguez? Thank you, Your Honor. May it please the court, counsel, for government, and full counsel, Mr. Burgenthal. May I proceed? Yes, yes. I'm here to argue the issue primarily regarding the comments made during the trial about race or ethnicity, as in this case, in relation to comments about the defendants and the clientele being from the Cuban or Cuban-American community. And the case law is very clear, particularly in Bowman, where the court has specifically said that the government's role is not just to obtain a verdict, but rather also to make sure and ensure that justice is done and not inject racial comments or Putting these comments into context, this trial was done in Palm Beach. It wasn't done in Miami, where there's a more diverse community, but rather it was done in Palm Beach. Both defendants were Cuban heritage . . . As well as their lawyers? As were their lawyers. Both of their lawyers were Cuban-American lawyers as well. Mr. Montesino and myself are Cuban-American as well. So in that context, with these comments being made, not only was it an attack on the defendants themselves, but also an attack on the lawyers and their ability to reform and gain credibility with this jury. Let me ask you this question now. The attorneys could have asked the court for a curative instruction to the jury. Ladies and gentlemen of the jury, race and ethnicity plays no part in these proceedings. Would that not have cured the problem if the attorneys had asked for a curative instruction? Your Honor, frankly, I was in that position and I specifically said I didn't want one. And I was asked to think about it or I specifically thought about it and no. Race or ethnicity, an attack on that type of situation, particularly in a community that's not as familiar with it, it's really a trigger. It's really a trigger. Once that trigger is pulled, it strikes a chord. And just repeating it or saying it in those individuals that already have a predisposition, it's not going to help. It's just going to re-ring it, reiterate it. There's a lot of errors that happen in trial where evidentiary matters, you can give that kind of instruction to the jury or general to go along with it. But something that is a trigger of emotion, of deep-seated prejudice . . . If I can go into the line because it kind of clarifies the line of questioning. Specifically, the question by the prosecution going into, and did you find people from a specific part of the community to participate in these crimes? This is a questioning of a convicted felon who had been charged, went to trial . . . This is the guy who was rounding up the clients. Yes, Judge. Was he the first witness as to whom these questions were put? I think he was one of the first witnesses, yes. When did the issue first arise and what was your objection? The issue first arises right at the beginning when he first takes the stand, pretty early on. First they go into his background. So it's someone that went to trial, the government doesn't particularly trust him, so you know that they met with him, prepared him, and what I'm driving at is, when did the issue first arise? I assume it was with the first witness. Yes, Judge. It arises right away with this first witness, it arises with him. Okay. And when was the objection first made? The first was right away. It goes . . . Immediately Sam Montesino said, objection. And the court says basis. And she is implicating an entire ethnic group. And then the prosecutor replies, I'm not implicating anybody. Then the court says, why don't you try to rephrase the question? And then the next question, are you familiar with the Cuban people here in Palm Beach? And they say, yes. What percentage of the clientele for these accidents were Cuban community? 98. And then it goes into . . . And she asks generally, do the Cuban community, do they know each other? And she answers, not everybody knows each other, because it's like, what do you think, like all Cubans hang out together? What is the objection lodged, and what did the court . . . That objection was there in this line of questioning. Then I lodged the next objection, which says objection, and the court says, just one moment. Then I said, lack of foundation, trying to figure out, where is this going? If you're not attacking this certain group of people, what is the foundation for this? And then she goes and establishes whether or not he knows the answer to the question. And frankly, then, after that, the line of questioning continues, and he goes, well, because Cubans all like fast and easy . . . Did you ask for a sidebar? I asked for, I reserved, and I asked . . . No, no, did you ask for a sidebar to discuss this matter out of the presence of the jury with the judge? No, we did not. You knew what was going to happen. No, I frankly . . . That what . . . I actually didn't. We were trying to figure it out, because first . . . No, no, no, what I'm saying is, you knew that most of the clients were of Cuban descent. My clients were, absolutely, yeah. Yeah, no, no, most of the clients are the chiropractic . . . I don't know that. I know they had Spanish surnames, because . . . Oh, all right, they had Spanish surnames. You knew that most of them had Spanish surnames. There's 18 countries that speak Spanish. I understand, but . . . So I could not assume that. I understand that. The question is, did you ask for a sidebar with the court to find out how far was this going to go, and for a cautionary instruction? Frankly, no, I did not believe this was going to happen, because once she said, no, I'm not going there, and I'm not attacking any specific group . . . It was, just following up there, what you're objecting to is the answer, not the question, because the witness said, because Cubans are always looking for money, they're looking for the easiest way to get money. Now, that was not a question. That was an answer. That was the answer, which I believe . . . And then you had the sidebar with the judge, and you decided that you did not want a curative instruction to that . . . There's nothing I could do, exactly. But that was an answer. The prosecutor did not ask him a question of whether Cubans were looking for money. She simply asked the question of, was there any reason why 98 percent of your clientele comes from the Cuban community? And I believe they knew the answer. Would the answer be because they speak Spanish? Wouldn't the answer be because they feel more comfortable with someone who spoke Spanish? If they don't prepare their witnesses, which I don't believe for a second that they don't prepare, this convicted felon who went to trial and lost and knew every answer to every question they were going to ask, I could buy that. But no, they had to know the answer. They knew what the answer was going to be, and it was clear. And there was nothing to do to fix that response that would have occurred. It was a complete shock because the initial representation was, I'm not doing this. I'm not going there. And then . . . Well, with the fact that the clientele was 98 percent Cuban, would that be relevant to the case? No. Why would it be relevant? Well, I'm asking you. No. What does that have to do with anything? And I don't even think that was shown. And I don't even think it was shown that they were actually Cuban, but rather some of them were also Spanish. Was this argued in the opening statement or in the closing statement by the prosecutor? The opening statement, the prosecutor indicated that they were going to have witnesses that spoke Spanish. Not that they were Cubans, but rather spoke Spanish and they were going to use a translator. So it was something that's . . . But you wouldn't object if you simply had asked whether 98 percent of the clientele spoke Spanish? Basically, I would think most of those clients spoke Spanish that went to that clinic. Was it argued in the closing? I don't believe that was argued in the closing. But again, throughout the trial, there was a tenor and tone. Once this shifted, I mean, it just became almost like a centerpiece of the trial. There's nothing you can do to fix this thing. These two Cuban lawyers are sitting there . . . Thank you, Your Honor. Mr. Bargainville. May it please the Court. Your Honor, the issue that I'm going to address concerns the district court's improper methodology in calculating the loss amount in this case. Effectively, what the district court did was basically take the total amount of money that was either billed to the various insurance companies as an intended loss, or the money that was paid by the insurance companies to the clinic as an actual loss, and then took the position that every dime that went into V&V was essentially the product of a fraud. The district court's approach was premised on an irrelevant and collateral state court statute that concerned the appropriate licensing or non-licensing of healthcare clinics. You have to, in order to prevail on appeal, don't you have to convince us that the factual findings by the district court are clearly erroneous? Yes, Your Honor. And so what factual findings can we say are clearly erroneous? That's a pretty heavy standard of review. Factual findings . . . well, first of all, Your Honor, the factual findings are reviewed for clear error, but then there's also . . . there's plenary review on legal determinations. And I think that the court's ultimate decision was based upon a legal determination that the fact that the clinic was not licensed somehow rendered every claim that was submitted fraudulent within the meaning of the mail fraud statute. So the court had to make an estimate because it couldn't tell which ones were and which ones weren't? No, Your Honor. All right. My . . . our position was we have to go ahead and get away from a blanket assumption that every claim that was submitted was fraudulent. And in that regard, what we did . . . Did the court say that every claim submitted was fraudulent? Yes. Yes, Your Honor. And what we did in the sentencing submissions, and it's at Docket Entry 143, Attachment A, there was a four-page submission that was attached to DeVico's sentencing objections that set forth a list of all individual patients whom DeVico's contended legitimately received chiropractic and massage services or therapies that were both medically necessary and properly billed. But the question, it seems to me, is who owned and operated this clinic? And if the owners and operators were the defendants, then every service that was provided would have been provided in violation of Florida law, and therefore it would fit under the guidelines. Well, Your Honor, the Florida law that was in effect at the time was purely a strict liability regulatory statute. And if I can draw an analogy, I think that this court . . . Let me think of the case. I think it might have been United States v. Medina, which was a health care fraud and government kickback case. And when it came up on appeal, one of the sentencing issues was whether the court made an appropriate blanket determination that all amounts billed or all amounts received was the appropriate loss figure. And Medina was a kickback case. And you had, I think, testimony from a Medicare representative in Medina that said, well, had Medicare known that the kickbacks were being paid, we would not have paid a single claim that was submitted. And that's similar to this situation because the Florida statute said an unlicensed clinic's claim is non-compensable. But the panel in Medina held that, no, this has got to go back and we have to make an individual determination as to what claims were fraudulent and which claims were not. And the issue . . . All the claims were represented to have been the services provided by a chiropractor. All the claims . . . Or under the supervision of a chiropractor. Actually, Your Honor, the . . . Were they not? The claims are represented on what's called a 1500 form. I understand. But it wasn't the representation to the insurance carriers that all of the services that were performed were either performed by a chiropractor or under the chiropractor's supervision. Or a licensed massage therapist. Yes. Yeah, exactly. As opposed to a taxi driver doing it. Right. And what happened, Your Honor, there was some proof at trial that was elicited that there were some false claims that were submitted on the 1500 form. The 1500 form does not require or does not suggest, and there's no representation, that the clinic itself is appropriately licensed. As a matter of fact . . . No, no, no, no. It's a representation that the service was performed by a chiropractor or under the chiropractor's supervision. Or a massage therapist, yes. Yeah, and the fact . . . and that was not so. That was not so on some of the proof that was seduced at trial. With the exception of the limited time that Adams was present, that was so. Is that not the case? Dr. Adams was present over an extended period of time. For one day a week, was it? Four hours a day or something? For one day a week for four hours a day. Yeah. But a licensed massage therapist can submit the claims. A licensed massage therapist can go ahead and provide the appropriate treatment. Under the doctor's supervision. Yes, and there were other chiropractors who were also employed by B&B, and the record is clear on that as well. And what we have here is that at the time of sentencing, the defense did submit a list of all individual claims that were submitted that were medically necessary treatments and were actually provided. And the government never contested that. And the court . . . All right, your argument is the court just ruled it out of order, in effect, because they weren't licensed. That's the gist of your argument? Yes. Okay. Well, that is a factual finding then, not a legal finding. That is, the court found that this was a fraudulent scheme, and therefore the services were provided by an unlicensed clinic. The services were provided by individuals who had the appropriate licenses. But in a scheme in which those who own and operate it did not have a license. Judge? Because they hired licensed individuals. The scheme . . . Yes. . . . as defined in the indictment, and the scheme as represented by the government in both prior to trial and during its closing arguments, focused on the submission of the false 1500 forms. They never alleged in the indictment that the fraud involved a representation that the clinic was appropriately licensed. The indictment charges in the object of the conspiracy, and also in the scheme to defraud, that it involved the submission of fraudulent PIP claims, which focused on the provision of chiropractic . . . I think we understand your point. You saved us a lot of time. Mr. Wu? Good morning. May it please the Court. Jason Wu on behalf of the United States. With me at counsel table is Ellen Cohn, who tried the case. I'm going to turn straight to the two arguments that they discussed today in their time. I'll start with the trial error point about the single answer about Cubans, and then move on to loss amount, unless you would prefer a different order. So I think on the first issue, once we have the record clear, once we clarify certain points of the record, I think the answer follows very quickly. So let's go through some of the assertions made today, and then look at the record. The first assertion is that this was an invitation to the jury to convict the Vicos on the basis of their nationality. The reason that's not possible and it's not true, first of all, is that the jury did not know the Vicos' nationality. No witness identified the Vicos as Cuban. None of the counsel referred to them as Cuban in the presence of the jury, which wouldn't be evidence in any event. And so that takes care of the claim in and of itself. Moreover, however, in response to one of the questions that Judge Choflat raised, I think it's important to look at the context in which this answer came about. Judge Choflat, you asked, when did the issue first arise? The issue arose because defense counsel, in cross-examination of an earlier witness, Dr. Adams, specifically asked, were the people coming to this clinic, were they of all nationalities, or what were they? And Dr. Adams replied that she believed they were mostly Cuban or almost entirely Cuban. They left that hanging out there. And so with a later witness, the government attempted to— Well, that's not what their basis for their objection now. Correct. The fact that all of the clients were Cubans, okay? What they're objecting to is the answer that was given by Mr. Ramirez, because Cubans are always looking for money, they're looking for the easiest way to get money. Now, what does that have to do with the case? So I think it's important to realize that's not the question that was asked of him directly, and that was not the answer the government intended to elicit. The government didn't know what their star witness was going to say when they asked him that question, when they put him on the witness stand? It was a surprise answer to the government. There's no doubt about that. Well, when I look at this colloquy, it doesn't reflect that, because there's a long colloquy by the government before we even get to that answer. Sure, but I think— until they got this answer, and then it moved on. I think the way you can tell that's not the answer the government intended to elicit is by looking at opening argument, where the government said its theory of the case was that this operation targeted Spanish speakers, because it wanted people who would not be able to read these treatment forms, who would sign these blank forms, essentially giving blank checks to V&V. Well, that's not the answer that the witness gave, is because I'm Cuban and these Cuban clients are more comfortable with me. That's not the answer that he gave. The answer that he gave was, because Cubans are always looking for money, they're looking for the easiest way to get money. The government didn't know that he was going to answer the question that way, their star witness? Well, I think you have to realize when you have a cooperator, you meet with them a few times, but you aren't necessarily able to cover all of your questions in detail. I would also point out, this was never asked of any other witness. If that's the case, then the government could have stopped earlier, rather than prompt the witness and continue with the colloquy and press the witness until he got this answer. Well, again, the pressing is not saying, there was no hinting or leading in the question as to that would elicit this particular answer. It was just why were they Cuban? The answer could have been they were Spanish speakers. The answer could have been because I recruited people I knew or acquaintances of acquaintances, and they happened to mostly be Cuban. Again, this came about because there was an earlier answer, and there was a concern that the defense might use this as some sort of defense theory. In response to that, you want to tie it off. You want to dispel any notion that this had relevance to the case by asking your own witness and getting an innocuous answer. Unfortunately, that's not what happened. But I'll also point out, no other witness was asked this question, and the government never sought to repeat this point, either with a witness or in closing argument. Again, I think that further establishes that wasn't the government's intent, and the government didn't try this case on the basis of nationality. In addition, I'll point out, I think it's worth looking at the Bowman case, which was cited by the appellants here today and also in their briefs, because I think it's instructive on this issue. In Bowman, there was a single exhibit with a racially inflammatory line. It was not stricken, and the appellate court, this court, concluded that it probably better would have been redacted or stricken. Nonetheless, Bowman referred to it, the case referred to that, as but a brief flicker in a three-week trial with overwhelming evidence of guilt. That's exactly what we have here. An answer came in. We don't dispute that the content of the answer itself was inappropriate, but it was not what the government intended to elicit, never referenced. We also have a recent Supreme Court case, Buck v. Davis, an opinion written by the Chief Justice of the Supreme Court, race prejudice cannot be considered by a jury in determining future dangerousness. Doesn't this reflect a sort of a trend on the part of the Supreme Court? A defendant is denied a right to a fair trial when the prosecution brings rape and ethnicity into the criminal proceeding? The total body of the Supreme Court's case law and this court's, and all appellate courts' case law on this issue is very clear, and there's a balancing. It is true that there's broad statements that race or prejudice should never be used to decide the case. Of course, we agree with that. Because it denies the defendant a fair trial when the jury factors in ethnicity in reaching its verdict, right? Correct. But let me make, I think, two important points. The first is, as the Supreme Court has said, and as this court has said, defendants are not entitled to perfect trials because there are no perfect trials. They're entitled to fair trials. So in this regard, first of all, the reason, the only reason this answer remains in the record is because defense counsel specifically refused the invitation to strike it and take the curative. But secondly, I think the clear statement of the rule in this area actually comes from the Seventh Circuit case, Smith v. Farley, again cited by the appellants in their brief. And that states, I'll quote it exactly, one or two isolated references to race or ethnicity, wholly unlikely to sway a jury, do not compel a new trial on federal constitutional grounds when the defendant's guilt is established by overwhelming evidence. Oh, we're not in the Seventh Circuit. We're in the Eleventh Circuit. Well, I think it's consistent, as I said, with this court's decision in Bowman where there was a single racially inflammatory line in an exhibit. The court looked at it and said, in the light of a three-week trial where there's overwhelming evidence of guilt, this is but a brief flicker. That's exactly what we had here. The witness gave an answer that we don't dispute as inappropriate, but it was not the answer intended to elicit. We did not reference it in closing argument or suggest that it bolstered any evidence of guilt. The defendant's own ethnicity or nationality was not before the jury because no one knew they were Cuban. You're saying the error is harmless? Even if there was an error, it was harmless? Correct. So I'm suggesting, first of all, there's no error. He was given an opportunity for a curative instruction. After that, was that not? Correct, correct. After this answer came about, at the close of that trial, Dave, there was a sidebar discussion with the judge. The judge urged counsel, do you want me to strike it and give you a curative? Counsel specifically, as they conceded today, said no. The judge even asked them, think about it overnight. I'm willing to correct this tomorrow morning if you think that's better, and they never came back. Didn't they object and then move for a mistrial? Correct. That's why we're not arguing plain error or invited error. We recognize they objected and asked for the mistrial, but nonetheless, I think that informs both the harmless error analysis and your consideration of whether there was error at all. I'll also note there are a few side points which I think are important to address. The first is that defense counsel suggested today an argument that this trial was done in Palm Beach and that somehow those juries would be more susceptible to an invitation to convict on the basis of race or nationality. I think that does discredit to our fellow residents in Palm Beach. But more than that, I think if you look at the jury selection in this case, you'll actually see that, as you'd expect of a South Florida jury, we had a diverse jury. You can look at that at docket entry 221. The jury's identified at pages 264 to 65. And throughout the record, you see there are jurors who are Spanish speakers who are, in fact, able to understand the Spanish language witnesses and sometimes raise issues with the judge concerning the quality of the translation. So the idea that this was somehow a jury that would be susceptible to this sort of invitation to convict on the basis of nationality I think is disingenuous. Moreover, I think when you look at the totality of the evidence in this case, which I'd like to describe briefly, there was overwhelming evidence of guilt, in fact, comprehensive evidence of guilt. There were witnesses who filled literally every role, every essential role in this scheme. My understanding of our precedent, Supreme Court precedent, is if ethnicity and race is interjected into the criminal proceeding, even given overwhelming evidence of guilt, that's reversible error. Your Honor, respectfully, I think that's inconsistent with Bowman. And I think on the specific facts of this case, where the defendant's ethnicity was not even before the jury, or their nationality, given that the jury was not even told that the Vicos were Cuban, this would be particularly an odd case to apply such a stringent rule. I'll also note that that rule would have deleterious effects. But we'd have to infer that that was an intentional act on the part of the prosecutor. We'd have to infer, I would think, that the answer was intentionally elicited by the prosecutor. No, Your Honor, I disagree with that. For one thing, they have not raised any claim of prosecutorial misconduct. No, I understand that, but what I'm saying is, I think you missed the point. I apologize if I have, Your Honor. There is nothing in the record, other than the fact that the prosecutor interviewed the witness ahead of time... Correct. ...from which you could infer that the prosecutor intentionally elicited the statement. I take your point. I take your point. There's nothing in the record. Okay. Even taking it as a blank record and even... It'd be a different proposition if there's some evidence that this was an intentional act, I suppose, and then it was carried on further. Correct. Absolutely correct. What about the fact that when you look at the colloquy, the prosecutor pressed until it got the answer that it wanted? Again, I would stress, the prosecutor only pressed to the point where she asked an innocuous question. She asked, well, why were the majority of the clients Cuban? She didn't ask it... It's not as if she got multiple innocuous answers. She got non-responsive answers and so kept asking the question until she was attempting to get a responsive answer. Unfortunately, the answer that came out was inappropriate. But, again, I think there's nothing in the record, as Judge Schoflat points out, to suggest that this was a deliberate attempt by the prosecution to elicit this particular answer. And, again, never returned to, never referred to in closing argument, and only in the record because defense counsel refused the curative instruction. With my remaining time, I'd like to turn briefly to the issue of loss. As Judge Wilson pointed out, this issue is reviewed for clear error only here on appeal. And so it's important to look at what bases the district court had for its finding. Appellants have really ignored two of the three primary bases for the district court's finding at the sentencing hearing. The entirety of the district court's findings are at Docket Entry 236, 80 to 85, and it's worth going over each reason in detail. The first one is that the district court, which heard all of this trial testimony, including the massage therapists and employees who said that from the first day they worked at VMV, they were instructed to falsify or exaggerate claims. Taking that evidence in its totality, the district court found the clinic was set up as a fraud from its very inception. It was intended to generate fraudulent claims. And so that already provided an ample basis for the finding that all of the claims that came out of the clinic were fraudulent. The point was made that the indictment charged the scheme of submitting the claims. It did not backtrack to how those claims were generated. Correct, Judge Rebrano, but that's actually not an accurate description of the indictment in this case. If you look at the indictment in this case, paragraph 29A of the manner and means describing this conspiracy, it specifically said the vicos contracted or found a licensed chiropractic physician to act as the quote-unquote named owner of the clinic. And furthermore, earlier paragraphs in the indictment and the general allegations, which are incorporated into that count, reference the licensure requirements and the ownership requirements under Florida law. So it's very clear that the indictment put the defendants on notice of this theory from the very start. Moreover, it was alluded to in the government's opening argument. The government referred to this false ownership issue as quote-unquote another problem with the clinic. In other words, another issue, another fact that made all of their claims fraudulent. So this is not something that they heard for the first time at sentencing. The second reason the district court had for its finding was the highly suspicious pattern of payments that it saw in V&V's financial records. So it alludes to this, and our briefs describe this briefly, but what the forensic accounting analysis found was that there was over $1.5 million in V&V's business accounts that came from insurance companies, but no significant amount of cash that would come from patients paying deductibles or copays. The reason that's significant is that with these Florida PIP insurance policies, the patient is responsible for a very substantial deductible, often $1,000, and then a 20% copay along the way. So in other words, for every $10,000 you see of insurance payments, there could be $2,000, $3,000 of payments from the patients. There's no evidence of that in V&V's financial records. And the reason that's suspicious is, of course, when all of your patients are coming in, are being paid kickbacks, or are participating in staged accidents to come to the clinic, they're not going to pay that copay or that deductible. So that I'm clear now, is it clear that some of the claims were not fraudulent that the court took into consideration? Because I think that's what Mr. Bergendahl said. Our position is none of the claims are not fraudulent. But I'll address Mr. Bergdahl's point. He identified, as they identified at sentencing, a list of claims. That was an assertion by counsel. There was no evidence. He merely provided... Is it that the claims are sort of the fruits of a poisonous tree? It's more than that. I apologize for interrupting. It's more than that. So even taking those two reasons, putting them to the side, there's the straw ownership issue that you alluded to, Judge Rubino. All of these claims are fraudulent, because under Florida law, a non-licensed clinic, its claims are quote-unquote unlawful, non-compensable, and unenforceable. So there really are no legitimate claims. Actually, there was a license, but it wasn't by the VCOs who held the license. Correct. Correct. It was technically a licensed clinic. It's just that it was a straw or... It was phony. That's correct. That's correct. But there's testimony in the record, for instance, from the insurance investigators. One of them from Allstate made clear in his testimony, these companies will not pay any claims that are generated by a clinic with a straw owner. They understand that statute as we understand it to mean that a straw owner clinic is essentially generating non-compensable claims right off the bat. That's why the entirety of this loss amount is attributable to the VCOs for sentencing purposes and, of course, for forfeiture. If there are no further questions, we urge the Court to affirm the VCOs' convictions and their sentences. Thank you very much. Thank you. In response to the government's argument, I think they still missed a point of racism and why there's no place for it in our trials. Rather, claiming that for some reason the jury was never told that the VCOs themselves were Cubans. That's a ridiculous argument, quite frankly. There is no place for racism, period. It doesn't matter what ethnic group the person belongs to. We agree with that, but the question is, what is the government's role in introducing that concept, if at all? The government knew the answers. The government interviewed this person extensively. This is a guy that went to trial, lost. He's a highly suspected individual you're putting on the stand. You don't just launch him on the stand and play it by ear. This is a person who is highly dubious, an individual that you're going to carry out there on a leash, in exactly what they did. And if you look at the colloquy, there's no conclusion that you can reach other than they wanted that answer. From the beginning, the objection started and the warning was laid, and this is where you're going, and this is exactly where they went, and they got exactly the answer that they wanted, because that's what they wanted to do. And you can see it even in the... If we read the entire record, which we will, where else in the record will we find a reference to that? There's actually something... Can you pinpoint for us spots in the record that are tied to that answer? In the government's response and in the record during the testimony of Jennifer Addis... No, no, can you pinpoint...  It's a simple question. No, I can't. You can't? I can't. I can tell you... I know what the flavor is. Can you pinpoint anywhere in the record that the prosecutor drew on that answer and went from there? After that, no, Judge, but I can tell you that during the testimony and in the government's response of Jennifer Addams, she had previously said that the clients were from all walks of life, from all different communities. And then during the examination of Mr. Montesino, we asked her, didn't you previously say they were from diverse areas? Her answer all of a sudden became, no, they were mostly Cubans. That is the theme that they had established. That is what they wanted. It is clear from her change... Who answered that question? Mr. Montesino. The defense counsel asked her because he was relying on her report. I understand that. And then you get now... It came out of the defense counsel's question. Right, because we were relying on her report where she said they were from all different walks of life. I understand. And now the government has somehow... This witness's answer is now, no, they're from the Cuban community. That shows you what the theme of the trial was, and that's what they wanted to pound on, and that's exactly what they did. This thing happened early on in the trial, Judge. It didn't need to go any further. We could have... I asked for a mistrial. Let's restart. Let's not play these games. Let's not interject this type of evidence early on in the trial and set the tenor and tone throughout the trial about racism. Johnny O. did testify. Johnny O. did say he's a Cuban. It was clear that he's Cuban. It's clear as well. The counsel, from their surnames, at least were of Spanish origin, and it's something that was laid out early on, and it deprived and it really shook the defense up tremendously in their ability to perform. I think we have your argument. Thank you, Judge. Mr. Bergdahl. Judge, the prosecutor, in her closing argument, told the jury, and that is the crux of the case, all those treatment forms that went to the insurance companies. Those are the 1500 forms. You look at the indictment, and on the substantive counts, the mail fraud counts, each of the substantive counts is based upon a check that was mailed from an insurance company to V&V based upon a claim that was submitted. The claim is the 1500 form. So the fraud, the act that caused the harm, if any, was the submission of the claim that bore reference to either services that were not provided or provided and were not medically necessary. And that's the very, very essence of the fraud, not the fact that there was a Florida statute. In fact, Mr. Pfeiffer testified that the fact that a clinic is or is not registered is not something that the insurance company takes into consideration in making an initial determination whether to pay a claim. They rely on the 1500 form. The 1500 form makes no reference whatsoever to whether or not the clinic is appropriately licensed. Now, the government has suggested that perhaps the whole scheme was fraudulent, as the government has described it, because of the fact that there was no evidence of a copayment having been made. The fact that a copayment is not made is not in and of itself evidence of fraud. The court or the law in Florida doesn't require that you actually collect a copayment in situations where a copayment may be due. It only requires that you make an effort to collect it. You send the client the money, and you say, by the way, there's a copayment. We'd appreciate it if you pay it. If the person can't pay it, well, so be it. And that's the end of it. The law imposes no... Yes, your question, then, to see what we ultimately would have to decide. The sentencing judge found, by the preponderance of the evidence, that all of the proceeds from the clinic were due to fraud because the clinic's true owners were the defendants, and they didn't have a license. Now, is that clearly erroneous? It is not clearly... If you go ahead and you look at the trial transcript, that statement is not clearly erroneous. But what is erroneous is the legal conclusion that because of the fact that the clinic was not appropriately licensed, that it necessarily means that each claim that was submitted is fraudulent. And by analogy, I would again call the court's attention to United States... Counsel, I think we have your point in your time, sir. Thank you.